UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

THERESA BISLUK,                          )
                                         )
    Plaintiff,                           )
                                         )
    v.                                   )          NO. 09-3080
                                         )
BRIAN HAMER, LAINIE KROZEL,              )
PAT WELCH, JESSICA NUNES,                )
ROD BLAGOJEVICH, JOSEPH                   )
CINI, JENNIFER RICKER, SAM               )
FLOOD, and other presently              )
unknown individuals,                     )
                                         )
    Defendants.                          )

<u>OPINION</u>

RICHARD MILLS, U.S. District Judge:

Pending before the Court is the Defendants' Motion for Summary

Judgment.

## I. INTRODUCTION

Plaintiff Theresa Bisluk was employed by the Illinois Liquor Control

Commission ("the Commission") as a Liquor Control Commission Special

Agent.  After she was unable to obtain a geographical transfer, the Plaintiff

filed a Complaint asserting her civil rights were violated under 42 U.S.C.

§ 1983.  The Plaintiff alleges a First Amendment claim against each of the Defendants, contending that she was unable to obtain the transfer due to her political affiliation.  Additionally, the Plaintiff alleges her rights under the Equal Protection Clause of the Fourteenth Amendment were violated by Defendant Patrick Welch when similarly situated male employees received more favorable treatment.

The Plaintiff's Complaint alleges that, at all relevant times, Defendant Brian Hamer was the Director of the Illinois Department of Revenue. Defendant Lainie Krozel was the Chief of Staff of the Department and had administrative oversight over the Commission.  Defendant Patrick Welch was an Assistant Director of the Department and the head of the Liquor Control Enforcement Division of the Commission.  Defendant Jessica Nunes was the Director of Human Resources of the Department. Defendant Rod Blagojevich was the Governor of the State of Illinois. Defendant Joseph Cini served as an Assistant to the Governor of the State of Illinois.  Defendant Jennifer Ricker was an official of either the Department or the Governor's Office.  Defendant Sam Flood had

involvement in filling positions of employment at various governmental agencies under the jurisdiction of the Governor of Illinois.

The Defendants assert the Plaintiff's claims fail because she is unable to establish a prima facie case of discrimination based on political affiliation or gender. They further contend that Plaintiff's claims are barred by collateral estoppel, the Eleventh Amendment, qualified immunity and/or the statute of limitations.

## II. FACTS

### A. Background and Plaintiff's work for the Commission

Plaintiff Theresa Bisluk, at all relevant times, was employed by the Commission as Liquor Control Special Agent I in the Liquor Control Enforcement Division of the Illinois Department of Revenue ("the Department"). The Commission is a unit of government of the State of Illinois which was created by the Illinois Liquor Control Act of 1934, 235 ILCS 5/1-1 et al. The Commission enforces the laws of the State of Illinois regulating the manufacture, distribution and sale of liquor and alcohol products.

Employees designated as a Liquor Control Special Agent I ("Agent I") are represented by the Illinois Federation of Public Employees Bargaining Unit. An employee designated as a Liquor Control Special Agent II ("Agent II") is represented by the American Federation of State, County and Municipal Workers Union.

The position description of an Agent II states that Agent IIs, under direction, serve as Lead Workers over lower level Agents in the conduct of investigations and serve as Lead Workers over lower level Agents engaged in conducting field investigations of businesses and firms engaged in the manufacture, distribution, and retail sales of alcoholic beverages to detect violations of the Illinois Liquor Control Act. The only "subordinates" that Agent IIs supervise are employees in the position of Liquor Control Special Agent I. The Plaintiff states that, regardless of the written description, the duties of an Agent II are the same as those of an Agent I. However, Agent Is and Agent IIs belonged to different unions. The Department reserves the right to fill positions they deem necessary to make the Agency functional based on operational needs. Therefore, the Plaintiff contends there are no

prohibitions against filling a position held by an Agent II with an Agent I. The Defendants dispute the assertion only to the extent that Plaintiff is suggesting that Agent Is, by virtue of a geographical transfer, were permitted to convert to an Agent II.

On or about March 8, 2007, the Department signed off on the position description of the Agent II position. On or about March 15, 2007, Bonds Robinson signed a Vacancy Request Form requesting a Liquor Control Special Agent II be approved to serve as a "lead worker over lower level Agents engaged in the conduct of investigations concerned with the enforcement of the provisions of the Illinois Liquor Control Act."

For over 20 years, the Plaintiff had planned to move to Southern Illinois to operate her own vineyard. On March 27, 2007, the Plaintiff sent a handwritten letter to her supervisor, Eric Wisette, requesting a geographical transfer to the position being vacated by Agent II Mark Fournie. On the same day, Wisette forwarded the Plaintiff's request to Defendant Patrick Welch. On March 28, 2007, Welch sent an email to Defendant Jessica Nunes, instructing her to respond to the Plaintiff. Nunes

was a senior public service administrator and, according to the Plaintiff, was also the highest ranking person in the human resources office. The same day, in response to the March 15, 2007 Vacancy Request, Welch sent a Critical Vacancy Request to the Governor's Office for approval of the Agent II position.

On March 28, 2007, Nunes informed Welch that Plaintiff had no contractual rights to the Agent II position and that the position would need to be filled pursuant to the bargaining unit contract. Subsequently, Nunes emailed the Plaintiff instructing that she needed to submit an official Request for Transfer (RPS-65) to the Personnel Office and that Plaintiff needed to submit a CMS-100 form to formally apply for the Agent II position after the job was posted (as the Agent II position was in an entirely different bargaining unit). Although she had no independent recollection, the Plaintiff testified she had no reason to believe that Plaintiff did not then forward Nunes' instructions to Randy Mendenhall, the Plaintiff's union supervisor, on March 28, 2007, at 4:08 p.m., as reflected in Exhibit 20 in support of the Defendants' Motion.

The Plaintiff never submitted a CMS-100 for the Agent II position. She was informed that she had to wait for the position to be posted before applying.

Following her conversation with Nunes, the Plaintiff made a formal transfer request. At some point after Fournie retired, the Plaintiff completed and submitted to the personnel division of the Department a Request to Transfer (RPS-65) without specifying a desired work location, desired position, and without signing or dating the form. The Plaintiff did not know where the position would be posted. At the time she filled out the form, the Plaintiff desired to work in any county in Southern Illinois. The Plaintiff states that on March 27, 2007, by letter, she informed her supervisors that she wished to transfer to Fournie's position.

Around the time she submitted the transfer request form, the Plaintiff asked Nunes if she or someone in her office could inform the Plaintiff when a posting was made relating to the Fournie position. Nunes stated that Plaintiff should look at the CMS website because vacancies would be posted on that website.

In March of 2007 when the Plaintiff submitted a bid form to transfer to the southern Illinois position, it was returned to her by Nunes. The Plaintiff was told she had to wait until the position was posted to submit an application. After her conversation with Nunes, the Plaintiff checked the CMS website for vacancy announcements on a frequent basis. The Plaintiff was aware that postings were to be made for ten days.

In the beginning, the Plaintiff assumed she would receive the Agent II position without having to fill out any paperwork. The opening for the Agent II position was posted on October 18, 2007, and the last date to apply was October 31, 2007. The Plaintiff alleges it was never posted on the Illinois Department of Central Management Services website. The Plaintiff states she continued checking the website until she was informed in 2008 that an individual had been hired to fill Fournie's position.

The Plaintiff expected that her request to transfer would be approved if she asked. However, she never received anything from the Department stating she would be permitted to transfer. The Plaintiff assumed the Agent II position at issue was going to be posted as an Agent I. The Plaintiff

disputes the assertion to the extent that she claims Eric Wisette, her supervisor, was informed she would be allowed to transfer.

### B. Defendants and their roles in hiring

The Plaintiff is suing former Governor Rod Blagojevich because "the buck stopped there" and "he was the one who made the changes." Additionally, the Plaintiff alleges Blagojevich, a Democrat, had in place a scheme favoring individuals for state employment who were sponsored by his political supporters. The Plaintiff has no evidence that Blagojevich was personally involved in denying the Plaintiff a geographical transfer.

From March of 2007 to March of 2009, Defendant Jennifer Ricker worked in the Governor's Office. Previously, she was the Chief of Staff at the Department where she oversaw personnel matters. Defendant Lainie Krozel, the subsequent Chief of Staff, was Ricker's contact at the Department. Defendant and then-Governor Rod Blagojevich was a friend of the family of Krozel's husband. Krozel sometimes saw Blagojevich at social functions.

Defendant Joseph Cini was on the Governor's staff as Director or

Deputy Chief of Inter-Governmental Affairs. While in the Governor's Office, Cini had responsibility with respect to hiring and recruiting employees. In the Office of Inter-Governmental Affairs, Cini worked with Defendant Sam Flood in recruiting and hiring employees.

In her capacity as the Department's Chief of Staff, Lainie Krozel oversaw the other managers and supervisors, communicated with the Governor's Deputy Chief of Staff and crafted policy. Krozel assumed responsibilities for the Commission in 2007 when she became Acting Chief of Staff. Krozel handled staffing functions for the Department and Commission. Senior managers notified Krozel when they had vacant positions. Krozel assisted with hiring staff to satisfy the needs of an area. Krozel was involved in filling the Fournie position. She talked with Pat Welch, the Program Administrator, about the urgency in filling the position. Krozel and Welch communicated frequently about vacancies in his area.

On April 25, 2007, Defendant Welch was aware that Plaintiff sought a transfer to a position in southern Illinois because she had filed a grievance

relating to the denial of a transfer. Welch indicated that he was going to post the position to which the Plaintiff sought transfer as an Agent II position. Krozel became aware at that time of Welch's actions.

Regarding the position formerly held by Fournie, the Governor's Office approved filling it three times. The approval to post a vacancy announcement for the position came from the Governor's Office. The Defendants contend this is at least somewhat misleading because the highest scoring applicant declined the position. The Electronic Personnel Action Request ("ePAR") thus shows an additional approval since the second highest applicant accepted the position.

The request for filling Fournie's vacant position which was sent to the Governor's Office provided that if the position is not filled, a substantial number of liquor establishments would not be inspected and a corresponding loss of revenue would occur. The form stated that "there is no proposed candidate at this time." The Department must initially determine if funds are available to fill the position. When the position was approved by the Governor's Budget Office, it had already been determined

that there were monies available to fund the Fournie position. From March 19, 2007 when Krozel became Chief of Staff until Blagojevich left office, there was no change in the role of the Governor's Office in staffing positions.

On June 7, 2007, Jessica Nunes had an email exchange with Jennifer Ricker in the Governor's Office. Ricker asked her if there was a vacant liquor control agent position in the Metro-East area. Nunes informed Ricker there was such a vacancy.

Jessica Nunes played a role in filling every union position in the Department. As human resources director, Nunes would have approved the ePAR to fill the position. A Personnel Action Request ("PAR") form is an internal action form required for all postings and transfers. The unit the position is located in initiates the PAR. The form confirms there are funds available to fill the position.

The Critical Vacancy Committee met about every other week in 2007. It determined whether a request to fill a position should be approved. If the Critical Vacancy Committee felt there was a critical need for the

position, the request was approved. Once the Critical Vacancy Committee approved a request, an ePAR was entered. A Critical Vacancy Request to fill Fournie's position was made on March 15, 2007 and approved on March 28, 2007.

The PAR form for filling Fournie's position indicates as follows: (1) both Thomas and Hamer initially approved filling the position; (2) Gladyse Taylor of the Governor's Office thereafter approved filling the position; (3) after Taylor approved filling the position, it was approved by the PAR Committee; (4) a selected candidate was submitted to and approved by Taylor; and (5) a new selected candidate was resubmitted to and approved by Taylor. The completion of the PAR form allowed the process of filling Fournie's position to move forward.

C. Commission's utilization of Agent Is and IIs

The Special Agent II eligibility list for St. Clair County, Illinois was used to fill the Fournie vacancy. A person on the eligibility list for Special Agent II in another county would not be considered for the position. The list is requested based on where the position is established. There was no

one on the St. Clair County Special Agent II list on November 27, 2007. The Department had to request that CMS administer a test to prepare an eligibility list from St. Clair County. That takes six to eight weeks to schedule. After the test was administered and graded, an eligibility list can be requested.

The Agent II position required an automated multiple-choice test administered by Central Management Services. Examinations were conducted between January 28, 2008, and January 31, 2008. The Plaintiff never took the required test. The Plaintiff states she previously secured an "A" grade for the Agent II position when she took the test in 1995. However, the Defendants note that because grades remain on the eligibility list for only one year, the Plaintiff's 1995 grade is immaterial.

The request for the eligibility list was made on February 4, 2008. CMS prepared the eligible list after that date.

On or about March 27, 2008, interviews were conducted for the Agent II position and all eligible applicants received a "Rutan score," based upon a standardized evaluation form. According to the Defendants, this

scoring system designed to standardize the interview process for non-confidential positions in public employment was implemented after the United State Supreme Court's decision in Rutan v. Republican Party of Illinois, 497 U.S. 62 (1990). Eligible applicants were ranked accordingly. Political affiliation was not a criterion. The Plaintiff claims the test was administered only to the eligible applicants on the eligibility list for St. Clair County, Illinois.

Edward Lauko, Becky McClure, Candice Nettleton, Gary Foster and Robert Wiebler were interviewed for the position. The top scoring applicant, Lauko, was offered the position but he turned it down. The second highest scorer, Becky McClure, was offered the Agent II position, which she accepted on or about April 24, 2008. McClure received a "B" grade. After the candidate was selected, the Governor's Budget Office gave the final approval to fill the position. McClure was a former member of the Randolph County Board. She ran for elective office as a Democrat.

### D. Plaintiff's grievance and efforts to secure geographical transfer

The Plaintiff grieved the geographical issue with her union. On

December 18, 2008, an arbitrator found that "the failure to grant a request which would have brought another Agent I to Metro East was not arbitrary. It was a reasonable exercise of management rights for a valid operational reason. There was certainly no evidence of any Contract violation."

Defendant Patrick Welch testified at the arbitration hearing that during June and July of 2007, the territories were being restructured. It was the Department's intention not to have disproportionate numbers of Agent Is or IIs in any single territory. That was one of the reasons, according to Welch, that he decided to fill the Agent II vacancy in Southern Illinois with another Agent II, believing that there were valid operational reasons to have an Agent II in that territory. Welch testified that in the event of larger scale joint operations, an Agent II would be available to lead and coordinate subordinate agent activities.

The Plaintiff considers herself a pro-life conservative who votes Republican. Although the Plaintiff is not an official member of any political party, she was a non-paid volunteer for Lou Casper–a prominent Republican in Cook County, Illinois--when she was very young. The only

time the Plaintiff has donated money to political candidates was after filing this lawsuit. The Plaintiff has never held herself out in the community to be a Republican. However, the Plaintiff was a Republican election judge for many years. In 1994, moreover, the Plaintiff states that through Casper, she did political work for then-Governor Jim Edgar.

The Plaintiff has no records or documents that support her allegation that Defendants Brian Hamer, Lainie Krozel, Jessica Nunes, Joseph Cini, Sam Flood, Jennifer Ricker, or Patrick Welch participated in denying the Plaintiff a geographical transfer. The Plaintiff has no evidence that Defendants Hamer, Krozel, Cini, Flood or Ricker knew her political affiliation and/or were aware she was a Republican and used that as a factor in denying her a geographical transfer. The Plaintiff's only evidence Nunes knew her political affiliation is that Plaintiff alleges Nunes received her resume. However, the Plaintiff's resume does not indicate she is a Republican. The Defendants have never read the Plaintiff's resume. The Plaintiff acknowledges the foregoing facts are undisputed but suggests that documents produced in discovery and as alleged by the Plaintiff might

provide otherwise.

    E. Defendant Welch's relationship with Plaintiff

The Defendants allege Welch first learned about the Plaintiff's claim there was a conspiracy to "get rid of the Republicans" on May 2, 2008, via email from Agent Gary Doyle. Prior to Agent Doyle's May 2, 2008 email, Welch had no knowledge of the Plaintiff's political affiliation. The Plaintiff disputes the allegation and alleges Welch knew of her political affiliation at least in or around October of 2007. When Welch assumed oversight responsibility for individuals who worked for the Commission as liquor control agents, John Vrlec, an Agent II, spoke frequently with Welch and they developed a relatively good working relationship. From time to time during his employment with the Commission, Vrlec had assisted the Illinois State Police in investigating possible acts of misconduct on the part of Commission employees. Welch was aware of that work on Vrlec's part. Late one business day, Vrlec received a telephone call from Welch at his home where he had been doing paperwork. He recalls the telephone call occurred approximately six months prior to the death of his wife in April in

2008. During the conversation, Welch stated he wanted Vrlec to "tail" the Plaintiff because Welch thought she might be engaging in misconduct. When Vrlec asked him what he believed she might be doing, Welch was unable to answer those questions or state why it might be appropriate to conduct surveillance on the Plaintiff.

During the conversation, Welch stated that he knew where the Plaintiff came from. He knew that Lou Casper was "her guy" who the Plaintiff supported. Welch then made some derogatory comments about Casper's conduct around females that he had politically sponsored. John Vrlec felt uncomfortable about performing the task Welch asked him to undertake. Vrlec did not understand why her association with Lou Casper would be reason for him to follow her. At the time, Vrlec had known the Plaintiff for several years from their work at the Commission. They both worked in territories located in northeastern Illinois. Based on what he knew about the Plaintiff, Vrlec could think of no reason why following her might be warranted. Vrlec informed Welch that he did not feel comfortable doing what had been asked of him.

The Plaintiff has no statements on paper by Defendant Welch disparaging the Plaintiff for her gender. The Defendants allege Welch has made no statements to anyone disparaging the Plaintiff for her gender. The Plaintiff disputes the allegation to the extent that she claims Welch was highly critical of her performance and that of another female agent to two different supervisors. The Plaintiff and others believed the criticism was unwarranted and not based on work performance. Eric Wisette, who reported to Welch, reviewed the written work product of agents, including the Plaintiff, who reported to him. Wisette believed Welch to be particularly critical of the Plaintiff and another female agent. Wisette believed the performance of the Plaintiff and the other female agent was satisfactory and at least as good as the work performance of other agents who worked under his supervision. According to Wisette, the male agents working under his supervision did not receive from Welch the same criticism that was directed at the Plaintiff and the other female agent, even though the women's performance was as good as, if not better, than that of the male agents.

During the relevant time period, George Gottlieb supervised the Plaintiff and other special agents. Generally, while supervising the Plaintiff, Gottlieb believed the Plaintiff's performance was equal to or exceeded that of most of the agents he supervised. When he reported to Welch, Gottlieb believed Welch was more critical of the Plaintiff than he was of the other agents Gottlieb supervised. Welch would occasionally direct Gottlieb to issue reprimands to the Plaintiff. He did not do that with other agents whose work performance was either comparable to or less satisfactory than the Plaintiff's.

F. Additional facts relating to transfer

The Plaintiff knows of no Agent I that requested a geographical transfer and then was permitted, by virtue of that transfer, to convert to an Agent II.

The Defendants contend the Plaintiff has no evidence that previous transfers permitted by the Department involved the transferee assuming the job responsibilities of the predecessor. There has been no showing that, when an Agent I moved to an area where there had been an Agent II, that

she performed Agent II work. The Plaintiff disputes the foregoing allegations and further provides a number of examples of an Agent I replacing an Agent II and thus performing Agent II work.

The Defendants contend they did not participate in denying the Plaintiff a geographical transfer. The Plaintiff asserts the Defendants' efforts did precisely that.

Nine days after filing the instant lawsuit and, in an effort to "collect evidence that Plaintiff had been screwed again," the Plaintiff emailed Jessica Nunes asking about how to apply for a geographical transfer. Nunes explained the process to the Plaintiff. The Plaintiff monitored the CMS website to identify postings for vacant special agent positions.

When Curt Plottner left his position, a vacancy announcement for his position was posted on the CMS website. The Plaintiff hand-delivered her application for that position to the Department's personnel unit along with her transfer request form. She was informed that she had the wrong application. The Plaintiff asked for the proper application and began filling it out in view of the Department's personnel staff. She completed the

application and presented it to the staff. At the time, she was informed the position had been pulled and her application would not be accepted. Upon returning home, the Plaintiff checked the CMS website and discovered the position was still posted and it continued to be posted for approximately two more weeks. The Plaintiff called various individuals to follow up on what she could do to pursue her interest in the position. The Plaintiff received no answer for a few months. Eventually, she received an email from Lainie Krozel informing her that it was decided the position would not be filled due to pending layoffs. Two months later, Plottner returned to employment with the Commission and was returned to his former position.

Subsequently, Curt Plottner relocated to a position in Kankakee, Illinois. A vacancy announcement to fill his vacancy was posted for Adams County, Illinois. The Plaintiff did not apply for the position because it was too far north from her home in southern Illinois. Travis Raffino, a Special Agent I, applied for and was awarded the position. In his new position, Raffino works a territory in southern Illinois, an area which the Plaintiff could have covered from her home in southern Illinois. Raffino did not

work in Adams County, Illinois.

As of April 21, 2009, the Plaintiff did not have a copy of the union contract. The Plaintiff remains employed as a Liquor Control Agent I.

### III. DISCUSSION

#### A. Legal Standard

Summary judgment is appropriate if the motion is properly supported and "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). The Court construes all inferences in favor of the Plaintiff. See Siliven v. Indiana Dept. of Child Services, 635 F.3d 921, 925 (7th Cir. 2011). To create a genuine factual dispute, however, any such inference must be based on something more than "speculation or conjecture." See Harper v. C.R. England, Inc., 687 F.3d 297, 306 (7th Cir. 2012) (citation omitted). Because summary judgment "is the put up or shut up moment in a lawsuit," a "hunch" about the opposing party's motives is not enough to withstand a properly supported motion. See Springer v. Durflinger, 518 F.3d 479, 484 (7th Cir. 2008). Ultimately, there must be enough evidence in favor

of the non-movant to permit a jury to return a verdict in its favor.  See id.

## B. Plaintiff's First Amendment claims

In Counts I-VIII of her Complaint, the Plaintiff alleges each of the individual Defendants violated her First Amendment rights.   In Rutan v. Republican Party of Illinois, 497 U.S. 62 (1990), the United States Supreme Court determined that the First Amendment's prohibition of patronage dismissals that was previously recognized "extends to promotion, transfer, recall, or hiring decisions involving public employment positions for which party affiliation is not an appropriate requirement."  Id. at 68. Therefore, it violates the First Amendment rights of public employees to base transfer, inter alia, on political affiliation or support.  See id. at 75.

There is no dispute that Plaintiff's political associations and affiliations are protected by the First Amendment.  Following the United States Supreme Court's decision in Gross v. FBL Financial Services, Inc., 557 U.S. 167 (2009), there was some confusion regarding whether a "but for" analysis or "motivating factor" analysis should be used in determining causation issues in First Amendment cases.  The United States Court of

Appeals for the Seventh Circuit determined that the "but for" standard articulated in Gross does not affect First Amendment political patronage cases. See Greene v. Doruff, 660 F.3d 975, 977 (7th Cir. 2011); see also Brown v. County of Cook, 661 F.3d 333, 335 (7th Cir. 2011) (observing that the "motivating factor" analysis remains applicable in First Amendment political affiliation cases). Consequently, the burden-shifting framework articulated in Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274 (1987) remains the standard in First Amendment cases such as this one. See Greene, 660 F.3d at 977.

Therefore, in a case alleging denial of transfer, a plaintiff may establish a causal connection by demonstrating that her lack of political affiliation was a substantial or motivating factor in her ability to secure a transfer. Simmons v. Chicago Board of Education, 289 F.3d 488, 495 (7th Cir. 2002). If the plaintiff meets that burden, the defendant may still prevail by showing by a preponderance of the evidence there was a legitimate, non-discriminatory reason for the denial of the transfer. See id.

Upon reviewing the Parties' briefs and exhibits, the Court concludes

that Plaintiff cannot meet her burden because the record shows that Plaintiff did not submit the necessary paperwork to be considered for the transfer. Defendants' Exhibit 19 appears to be a copy of the posting for a "Liquor Control Special Agent 2" located in Fairview Heights, Illinois. It provides that the date posted was October 18, 2007, and the last day to apply was October 31, 2007. The job description provides that the employee "serves as lead worker over lower level agents." It further states, "Candidates must have a qualifying grade or have submitted application to CMS to receive a qualifying grade prior to closing of posting period." Moreover, the submission of a "CMS 100 Employment Application" was also required. Although the Plaintiff claims the job was never posted, her assertion is contradicted by Exhibit 19. The Court can only conclude that Plaintiff did not notice the job posting, despite her allegation that she checked the CMS website on at least a weekly basis for Agent I or II positions in downstate Illinois.

This conclusion is bolstered by the testimony of Becky McClure, who eventually accepted the position. As reflected in Exhibit 26, McClure

testified she learned the position was available by seeing it on the CMS website.

Based on the foregoing, there is no legitimate factual dispute that although the job was posted for ten business days on the CMS website, the Plaintiff did not apply or take the required test and did not submit the necessary materials. Accordingly, the Plaintiff's political affiliation was not a substantial or motivating factor in the denial of her geographic transfer.

The Court further notes that even if the Plaintiff had properly applied for the transfer, summary judgment would still be appropriate as to Defendants Hamer, Krozel, Nunes, Blagojevich, Cini, Ricker and Flood. The Plaintiff testified she has no evidence that any of the Defendants knew of her political affiliation and used that as a factor in denying her geographical transfer. The First Amendment claims asserted against most of the Defendants are premised on the Plaintiff's belief or speculation that those individuals are aware of her political views. However, an individual's hunch about the motives of others is not enough to defeat summary judgment. See Springer, 518 F.3d at 484.

The Plaintiff did produce evidence that one Defendant, Patrick Welch, knew she was a Republican and, arguably, harbored animus against her based on political affiliation. Consequently, if the Plaintiff had properly applied for the geographical transfer, she might have sufficient evidence to withstand summary judgment against Welch on her First Amendment claims. Because the Plaintiff has offered no evidence that the other seven Defendants were aware of her political views, they would be entitled to summary judgment on that basis. See Brown, 661 F.3d at 336 (observing that a plaintiff cannot satisfy her burden that political affiliation was a motivating factor in an employment decision if she is unable to "even show that people who decided or advised on the decision were aware of [her] political affiliation").

The Defendants are entitled to summary judgment on the Plaintiff's First Amendment claims. Although the Plaintiff may have assumed the job would be posted as an Agent I, it was posted as an Agent II. Because it was posted as an Agent II position, the Department was prohibited by the terms of the collective bargaining agreement from offering the position to the

Plaintiff because she did not apply for, test for or interview for the position. This is true even if Agent Is and Agent IIs performed essentially the same work.

Because the Plaintiff's political affiliation was not a substantial or motivating factor in her inability to secure a geographical transfer, the Defendants are entitled to summary judgment on the Plaintiff's First Amendment claims.

### B. Plaintiff's sex discrimination claim

In Count IX, the Plaintiff asserts a § 1983 claim wherein she alleges she was treated differently than other agents in the Department because of her sex, in violation of the Equal Protection Clause of the Fourteenth Amendment. This count is directed only against Defendant Patrick Welch.

### (1)

A plaintiff can establish sex discrimination by using the direct method of proof or the indirect method of proof. See Harper v. Fulton County, Ill., 748 F.3d 761, 764-65 (7th Cir. 2014). A plaintiff proceeding under the direct method may avoid summary judgment by presenting sufficient

evidence, either direct or circumstantial, that the employer's adverse employment action was motivated by discriminatory animus. See id. at 765. Direct evidence establishes discriminatory intent without reliance on inference or presumption. See id. This type of evidence basically requires an admission by the decision-maker that the actions were based on the prohibited animus. See id.

A plaintiff may also point to circumstantial evidence that would allow a jury to infer intentional discrimination by the decision-maker. See id. "[C]ircumstantial evidence typically includes: (1) suspicious timing, ambiguous oral or written statements, or behavior toward, or comments directed at, other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; or (3) evidence that the employer offered a pretextual reason for an adverse employment action." Tank v. T-Mobile USA, Inc., 758 F.3d 800, 805 (7th Cir. 2014). A plaintiff may use these different types to construct a "convincing mosaic of circumstantial evidence" from which a fact-finder can infer

discriminatory intent.  See Hutt v. AbbVie Products LLC, 757 F.3d 687, 691 (7th Cir. 2014).

The Plaintiff does not rely on direct evidence.  The Plaintiff has presented evidence that Welch may have treated her and another female agent worse than similarly situated male agents.  However, there is no indication that Welch's animus was due to their gender.  Moreover, the Plaintiff cannot identify a male Agent I who requested a transfer and, based on the transfer, was allowed to convert to an Agent II.  The Plaintiff has not identified another individual who was permitted to transfer to a different territory without applying for the position.

Based on the foregoing, the Court concludes that Plaintiff has not presented circumstantial evidence that would allow the jury to infer intentional discrimination by Welch.

### (2)

Under the indirect method, a plaintiff establishes a prima facie of indirect discrimination by showing that "(1) she was a member of a protected class; (2) she was performing her job satisfactorily; (3) she

suffered an adverse employment action; and (4) the employer treated similarly-situated employees outside of the protected class more favorably." Hutt, 757 F.3d at 693.

The Plaintiff alleges that her inability to obtain a transfer constitutes an adverse employment action. A purely lateral move or transfer to a new position does not constitute an adverse employment action. See Everroad v. Scott Truck Systems, Inc., 604 F.3d 471, 480 (7th Cir. 2010). The same is true for a transfer involving no reduction in pay and only a minor change in working conditions. See id. The denial of a transfer to a lateral position wherein the employee expresses a "purely subjective preference for one position over another" does not constitute an adverse employment action. See Herrnreiter v. Chicago Housing Authority, 315 F.3d 742, 745 (7th Cir. 2002).

Based on the foregoing, the Plaintiff is unable to establish that she suffered an adverse employment action. The Plaintiff suggests that because she sold her home in Chicago and purchased a home in southern Illinois, there was a substantial change in the Plaintiff's position which made the

denial of her transfer an adverse action. However, this was the Plaintiff's decision based on a longstanding desire to move to southern Illinois. The fact that Plaintiff believed her transfer would be allowed at the time does not make its denial an adverse employment action and does not justify holding Welch accountable.

For this reason and because she is unable to identify a similarly situated male who was treated more favorably, the Plaintiff cannot establish a prima facie case of sex discrimination using the indirect method. Defendant Welch is entitled to summary judgment on that claim.

## IV. CONCLUSION

This case is somewhat troubling because there are credible allegations that at least one Defendant harbored animus towards the Plaintiff because of her political views. For the reasons stated herein, however, the Court concludes that Plaintiff is unable to assert a prima facie case of discrimination on the basis of political affiliation or sex.

Based on the foregoing, the Defendants are entitled to summary judgment on the Plaintiff's First Amendment political association claims.

Summary judgment is also appropriate as to the equal protection sex discrimination claim asserted against Defendant Welch.

<u>Ergo</u>, the Defendants' Motion for Summary Judgment [d/e 77] is ALLOWED.

The Clerk will enter Judgment in favor of the Defendants.

CASE CLOSED.

ENTER: October 9, 2014

FOR THE COURT:

s/Richard Mills
Richard Mills
United States District Judge